**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **RYAN KEETON, individually and on behalf of all others similarly situated,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **CASE NO. 3:18-CV-01876-G** |
| **FOUNDATION ENERGY MANAGEMENT, LLC,** | § § § | |
| **Defendant.** | § § | **JURY TRIAL DEMANDED** |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR
<u>CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE</u>**

Scott Griffith (Lead Counsel)
State Bar No. 08482150
sgriffith@griffithdavison.com
Jason L. Cagle
State Bar No. 24027540
jcagle@griffithdavison.com

**GRIFFITH DAVISON, P.C.**
13737 Noel Road, Suite 850
Dallas, Texas 75240
T: 972-392-8900
F: 972-392-8901

**ATTORNEYS FOR FOUNDATION ENERGY
MANAGEMENT, LLC**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

I.      Introduction and Summary of Arguments ..........................................................1

II.     Factual and Procedural Background ...................................................................2

        A.      Foundation operates oil and gas wells using the services of pumpers....................2

        B.      Pumpers' responsibilities revolve around keeping the wells producing.................3

        C.      Foundation uses independent-contractor pumpers in situations that require
                judgment and independent decision-making. ...........................................4

        D.      Independent-contractor pumpers negotiate their compensation, which can
                vary widely in arrangement and amount.................................................5

        E.      Mr. Keeton is unlikely to know about the circumstances of pumpers in
                regions other than the single region in which he worked. .......................6

III.    Mr. Keeton has failed to satisfy his burden to show
        a factual or legal nexus binding the putative collection....................................7

        A.      Mr. Keeton's misclassification claim requires analysis of whether other
                pumpers are similarly situated under the economic-realities test. .........10

        B.      Mr. Keeton has failed to produce competent evidence demonstrating the
                proposed collection is similarly situated................................................12

                1.      Mr. Keeton's Declaration is plainly insufficient to meet his burden........12

                2.      Foundation's evidence confirms Mr. Keeton is not similarly
                        situated to other pumpers throughout the nation......................................14

        C.      Mr. Keeton has not shown other pumpers are interested in joining this suit.........17

        D.      In the alternative, any collective action should be strictly limited to
                persons with circumstances similar to Mr. Keeton.................................19

IV.     Foundation objects to Mr. Keeton's proposed notice. .....................................19

        A.      Foundation objects to the court issuing the notice without a conference of
                counsel and additional briefing...........................................................19

        B.      The proposed notice is improper and insufficient................................................20

V.      Conclusion .............................................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Complete Landsculpture, Inc.*, No. 04-0776, 2004 WL
2293842 (N.D. Tex. Oct. 7, 2004) .......................................................................... 25

*Aguirre v. SBC Commc'ns, Inc.*, No. 05-3198, 2006 WL 964554
(S.D. Tex. Apr. 11, 2006) .............................................................................. 8, 10

*Ali v. Sugarland Petroleum,* No. 09-0170, 2009 WL 5173508 (S.D.
Tex. Dec. 22, 2009) .......................................................................................... 20

*Alverson v. BL Rest. Operations LLC*, No. 16-00849, 2018 WL
1324952 (W.D. Tex. Mar. 12, 2018) ................................................................ 23

*Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287 (S.D.
Tex. 2012) ................................................................................... 11, 12, 13, 14

*Bamgbose v. Delta–T Group, Inc.*, 684 F.Supp.2d 660 (E.D.Pa.
2010) .............................................................................................................. 12

*Barnes v. Abandonment Consulting Servs., L.L.C.*, No. 12-01399,
2013 WL 3884198 (S.D. Tex. Jul. 26, 2013) ............................................... 11, 20

*Baucum v. Marathon Oil Corp.,* No. 16-3278, 2017 WL 3017509
(S.D. Tex. July 14, 2017) .................................................................................. 21

*Behnken v. Luminant Mining Co., LLC*, 997 F. Supp. 2d 511 (N.D.
Tex. 2014) ............................................................................................... 9, 24, 25

*Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977 (D. Kan.
2018) .............................................................................................................. 13

*Blake v. Hewlett-Packard Co.*, No. 11–592, 2013 WL 3753965
(S.D. Tex. July 11, 2013) .................................................................................. 21

*Bosley v. Chubb Corp.*, No. 04-4598, 2005 WL 1334565 (E.D. Pa.
June 3, 2005) .................................................................................................... 23

*Botello v. COI Telecom, L.L.C.*, No. 10-305, 2010 WL 5464824
(W.D. Tex. Dec. 30, 2010) ............................................................................... 16

*Carey v. 24 Hour Fitness USA, Inc.*, No. 10-3009, 2012 WL
4857562 (S.D. Tex. Oct. 11, 2012) ................................................................... 11

ii

*Carrera v. UPS Supply Chain Solutions, Inc.*, No. 10-60263, 2012
   WL 12860750 (S.D. Fla. Sept. 14, 2012) ............................................ 13

*Christianson v. Newpark Drilling Fluids, LLC*, No. 14-3235, 2015
   WL 1268259, at *4 (S.D. Tex. March 19, 2015) ............................ 1, 11, 12, 13, 14

*Coffin v. Blessey Marine Services, Inc.*, No. 11-0214, 2011 WL
   13242968 (S.D. Tex. July 28, 2011) ................................................... 21

*Collinge v. IntelliQuick Delivery, Inc.*, No. 12-00824, 2015 WL
   1292444 (D. Ariz. March 23, 2015) ................................................... 13

*Creten-Miller v. Westlake Hardware, Inc.*, No. 08-2351, 2009 WL
   2058734 (D. Kan. July 15, 2009) ....................................................... 24

*Cruz v. ConocoPhillips*, 208 F. Supp. 3d 811 (S.D. Tex. 2016) ...................... 11

*D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889 (D. Md. 1995) ......................... 7

*Delaney v. Geisha NYC, LLC*, 261 F.R.D. 55 (S.D.N.Y. 2009) ...................... 23

*Demauro v. Limo, Inc.*, No. 10-413, 2011 WL 9191 (M.D. Fla. Jan.
   3, 2011) ................................................................................... 13

*Dorsey v. J & V Commc'n Servs., Inc.*, No. 04-0496, 2004 WL
   5621864 (S.D. Tex. May 19, 2004) ..................................................... 15

*Dreyer v. Baker Hughes Oilfield Operations, Inc.*, No. 08-1212,
   2008 WL 5204149 (S.D. Tex. Dec. 11, 2008) ......................................... 21

*Dyer v. Lara's Trucks, Inc.*, No. 12-1785, 2013 WL 609307 (N.D.
   Ga. Feb. 19, 2013) ....................................................................... 19

*Ecoquij-Tzep v. Hawaiian Grill*, No. 16-625, 2017 WL 2672328
   (N.D. Tex. June 21, 2017) ............................................................... 21

*Flores v. Act Event Servs., Inc.*, 55 F. Supp. 3d 928 (N.D. Tex.
   2014) ....................................................................................... 19

*Garcia v. Pancho Villa's of Huntington Village, Inc.*, 678
   F.Supp.2d 89 (E.D.N.Y. 2010) .......................................................... 24

*Gobson v. NCRC, Inc.*, No. 10–1409, 2011 WL 2837506 (S.D.
   Tex. July 18, 2011) ....................................................................... 21

*H&R Block, Ltd. v. Housden*, 186 F.R.D. 399 (E.D. Tex. 1999) ..................... 7, 8, 9

*Hall v. Burk*, No. 01-2487, 2002 WL 413901 (N.D. Tex. March 11, 2002) ...................................................................................................... 9

*Haynes v. Singer Co.*, 696 F.2d 884 (11th Cir. 1983) ................................... 9

*Heaps v. Safelite Solutions, LLC*, No. 10-729, 2011 WL 1325207 (S.D. Ohio Apr. 5, 2011) .......................................................................... 23, 24

*Hobbs v. Cable Mktg. & Installation of Louisiana, Inc.*, 290 F. Supp. 3d 589 (E.D. La. 2018) ................................................................ 13

*Hoffman v. Securitas Sec. Servs.*, No. 07-502, 2008 WL 5054684 (D. Idaho Aug. 27, 2008) .............................................................................. 24

*Hopkins v. Cornerstone Am.*, 545 F.3d 338 (5th Cir. 2008) ...................... 12

*Labrie v. UPS Supply Chain Solutions, Inc.*, No. 08-3182, 2009 WL 723599 (N.D. Cal. Mar. 18, 2009) ...................................................... 24

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987) ................... 8, 10, 13

*Magana v. Shore Constr., LLC*, No. 17-1896, 2018 WL 1316941 (E.D. La. March 14, 2018) ......................................................................... 19

*Mallory v. Lease Supervisors, LLC*, No.17-3063, 2018 WL 3368913 (N.D. Tex. July 10, 2018) ...................................................... 7, 19

*Mason v. Amarillo Plastics Fabricators*, No. 15-00109, 2015 WL 4481233 (N.D. Tex. July 22, 2015) ............................................................ 19

*McKnight v. D. Houston*, 756 F. Supp. 2d 794 (S.D. Tex. 2010) ............... 14

*Monroe v. United Air Lines, Inc.*, 90 F.R.D. 638 (D.C. Ill. 1981)) ........... 23

*Morales v. Thang Hung Corp.*, No. 08-2795, 2009 WL 2524601 (S.D. Tex. Aug. 14, 2009) ....................................................................... 9, 20

*Owen v. Golf & Tennis Pro Shop, Inc.*, No. 09-00571, 2010 WL 3859640 (E.D. Tex. Sept. 30, 2010) ............................................................ 15

*Parker v. Silverleaf Resorts, Inc.*, No. 14-2075, 2017 WL 1550522 (N.D. Tex. May 1, 2017) ............................................................................. 15

*Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369 (5th Cir. 2019) ............................................................................................ 12

*Pena v. Handy Wash, Inc.*, No. 14-20352, 2015 WL 11713032 (S.D. Fla. May 22, 2015) ............................................................................ 13

iv

*Phillips v. Carpet Direct Corp.*, No. 16-02438, 2017 WL 121630
(D. Colo. January 10, 2017) ............................................................................ 16

*Pierce v. Apache Corp.*, No. 18-1803, 2019 WL 338129 (S.D. Tex.
Jan. 28, 2019) ................................................................................................. 13

*Quintanilla v. A & R Demolition, Inc.*, No. 04-1965, 2005 WL
2095104 (S.D. Tex. Aug. 30, 2005) ................................................................ 10

*Ratliff v. Pason Sys. USA Corp.,* 196 F. Supp. 3d 699 (S.D. Tex.
2016) ................................................................................................................ 24

*Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 12-00596,
2015 WL 1346125 (W.D.N.C. March 24, 2015) ............................................ 13

*Romero v. J&F Analysts Inc.,* No. 15-00790, 2016 WL 612594
(S.D. Tex. Feb. 16, 2016) ................................................................................ 20

*Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820 (N.D. Tex. 2007) ............................. 22

*Salinas-Rodriguez v. Alpha Servs., L.L.C.*, No. 05-44, 2005 WL
3557178 (S.D. Miss. Dec. 27, 2005) ................................................................ 9

*Santinac v. Worldwide Labor Support of Illinois, Inc.*, 107 F. Supp.
3d 610 (S.D. Miss. 2015) ................................................................................ 22

*Shanks v. Carrizo Oil & Gas, Inc.*, No. 12-3355, 2013 WL
6564636 (S.D. Tex. Dec. 11, 2013) ................................................................ 14

*Simmons v. T-Mobile USA, Inc.*, No. 06-1820, 2007 WL 210008
(S.D. Tex. Jan. 24, 2007) .......................................................................... 8, 9, 10

*Songer v. Dillon Resources, Inc.*, 569 F. Supp. 2d 703 (N.D. Tex.
2008) ............................................................................................................ 8, 15

*Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843 (5th Cir.
2010) ................................................................................................................ 12

*Trinh v. JP Morgan Chase & Co.*, No. 07-1666, 2008 WL 1860161
(S.D. Cal. Apr. 22, 2008) ................................................................................ 15

*Villareal v. St. Luke's Episcopal Hospital,* 751 F. Supp. 2d 902
(S.D. Tex. 2010) .............................................................................................. 21

*Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462 (S.D. Tex.
2012) ............................................................................................................ 8, 22

*Williams v. Grayco Cable Servs., Inc.*, 187 F. Supp. 3d 760 (S.D. Tex. 2016) ........................................................................................................ 10

*Xavier v. Belfor USA Grp., Inc.*, 585 F. Supp. 2d 873 (E.D. La. 2008) .......................................................................................................... 9

*Yaklin v. W-H Energy Servs., Inc.*, No. 07-422, 2008 WL 1989795 (S.D. Tex. May 2, 2008) .................................................................. 15, 24, 25

*Yoakum v. PBK Architects, Inc.*, No. 10-00278, 2010 WL 4053956 (S.D. Tex. Oct. 14, 2010) ........................................................................ 20

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR**
**CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE**

Defendant Foundation Energy Management, LLC ("Foundation") files this Response in opposition to Plaintiff's Motion for Conditional Certification and Court-Authorized Notice (Docket Entry 22), which includes its brief of arguments and authorities supporting the Response.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENTS

Mr. Keeton asks this Court to certify a nationwide collection composed of all pumpers who were engaged as independent contractors by Foundation throughout the United States for the past three years. His request is based on the contents of his single and speculative Declaration. The critical issue is whether this Court would be able to apply the economic-realities test to the proposed collective as a group, or whether the circumstances of the proposed collection are so diverse as to "eviscerate all notions of judicial economy that would otherwise be served by conditional class certification." *Christianson v. Newpark Drilling Fluids, LLC*, No. 14-3235, 2015 WL 1268259, at *4 (S.D. Tex. March 19, 2015) (internal quotation marks omitted). Mr. Keeton has offered nothing to demonstrate a factual and legal nexus that would permit resolution of the putative plaintiffs' claims on a collective basis. In contrast, Foundation's evidence demonstrates significant differences between the circumstances of those holding the title of pumper, which include pumper companies with their own employees, pumpers whose pay is not based on the number of wells they service, and pumpers that provide additional non-pumping services to Foundation for additional compensation.

There is nothing about Mr. Keeton's situation as a pumper that could form the basis of a claim for any other pumper, and certainly nothing about his situation that could be indicative of the situation that every other pumper across the country has experienced for the last three years. For these reasons, the Motion to Certify should be denied. In the alternative, the conditional

1

certification should be strictly limited to independent-contractors similarly situated to Mr. Keeton, such as those who are: (1) individuals rather than companies with their own employees; (2) located in the Central Region where Mr. Keeton provided services; and (3) are paid per-well per-month for pumping services without providing any non-pumping services for additional fees.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Foundation operates oil and gas wells using the services of pumpers.*

Foundation is an independent energy company engaged in the exploration, development, and production of oil and gas. Appendix, Ex. "A," Declaration of Richard Payne, p. 1, ¶ 2 ("Payne Declaration"). It manages and operates wells in multiple geographic regions throughout the United States, including: (1) the Central Region (parts of Texas, Arkansas, Oklahoma, Kansas, and New Mexico); (2) the Southern Region (parts of Texas, Arkansas, and Louisiana); (3) the Rockies Region (parts of Utah, Colorado, Wyoming, North Dakota and Montana); and the Tri-States Region (parts of Colorado, Kansas, and Nebraska). *Id.*, p. 2, ¶ 3. The wells across these different regions have different lifecycles, geologies, and production capacities. *Id.*

In each of Foundation's regions, an operations superintendent manages foremen who, in turn, monitor, manage, and oversee the well operations. *Id.*, p. 2, ¶ 4. A foreman oversees the work of any employees on the wells, including any employee pumpers. *Id.*, pp. 2-3, ¶¶ 4, 7.

Foundation also enters into well-services contracts with independent contractors, including individuals and business entities, to provide pumping services on some wells in its various regions. *Id.*, p. 3, ¶ 9. The reasons to engage independent-contractor pumpers can vary. *Id.*, p. 4, ¶ 11. For example, Foundation might not operate enough wells in an area to provide full-time work to a pumper. Or the wells Foundation operates might be spread too far apart to allow effective supervision of an employee pumper. An independent contractor must be able to operate

independently and exercise their own judgment when performing the work on such wells. *Id.*

> B.      *Pumpers' responsibilities revolve around keeping the wells producing.*

A pumper's responsibilities include managing a host of factors to ensure that wells continue to produce. *Id.*, p. 2, ¶ 5. The pumper is responsible for tracking production and pressures for their assigned wells. *Id.* The pumper performs general well inspection, maintenance, repairs, and equipment replacements, and reports other maintenance, production, and health or safety issues to the foreman. *Id.* The pumper visits the assigned well sites, measures and monitors production, and checks for any safety or environmental problems at the well sites. *Id.* This is not an exhaustive list of the work that a pumper may perform. *Id.*

Each well has different needs that dictate the amount and scope of work to be performed by a pumper. *Id.*, pp. 2-3, ¶ 6. For example, some well sites have "rotating equipment" separate from the well itself, such as pumps, compressors, engines, and motors. *Id.* Pumpers confirm the rotating equipment is working, make minor repairs when needed, and determine whether to contact a mechanic to address more-serious problems. *Id.* Some well sites require use of chemicals to treat the well stream. *Id.* Pumpers monitor these sites to ensure the chemicals are present in sufficient supply and that the devices used to inject the chemicals are working. *Id.*

Independent-contractor pumpers communicate with Foundation's representatives, such as its foremen and operations superintendents. *Id.*, p. 5, ¶ 14. The independent contractors provide reports on their wells, which include information such as the wells' production data, any hours of downtime, temperatures at the well site, and the pumpers' comments. *Id.* Foundation uses the production data to create production reports required by governmental authorities. *Id.*, pp. 5-6, ¶ 1. On a case-by-case basis, a foreman might require a pumper to report on other items on the well sites, such as oil levels in well-site tanks or chemical levels in rotating equipment. *Id.*

C.    *Foundation uses independent-contractor pumpers in situations that require judgment and independent decision-making.*

When hiring pumpers, Foundation looks for individuals with prior experience in the oil and gas industry. *Id.*, p. 3, ¶ 8. When Foundation acquires new wells to operate, it often hires the same pumpers who worked for the prior operators. *Id*. When deciding whether to contract with an independent contractor for pumping services, Foundation looks for individuals and companies with more experience and higher levels of skill than average. *Id.*, p. 4, ¶ 12. Independent contractors need to be dependable and able to use good judgment to make on-the-ground decisions and to solve problems. *Id*. Independent-contractor pumpers often perform their services at the well sites by themselves, without on-site supervision. *Id*. The well sites are frequently in remote locations, which can be outside the range of cellphone service. *Id*. They need to be able to identify problems, determine when to solve the problems themselves, and when to seek assistance from others. *Id.*

Independent-contractor pumpers determine how frequently to visit a well, what services need to be performed, and what issues need to be reported to third-parties for assistance. *Id.*, pp. 4-5, ¶ 13. Different well sites need to be visited at different intervals—some wells need to be visited more often than others. *Id.* This creates irregular patterns of days and hours worked for independent-contractor pumpers. *Id.* No one at Foundation sets their schedule. *Id.*

Independent-contractor pumpers provide their own transportation and the tools needed to perform their services. *Id.*, pp. 6-7, ¶ 18. They provide their own insurance policies. *Id.* Independent-contractor pumpers are required to follow Foundation's safety policies and may attend safety training. *Id.*, p. 9, ¶ 27. Foundation provides safety equipment to the pumpers. *Id.*, pp. 6-7, ¶ 18.

4

D.     *Independent-contractor pumpers negotiate their compensation, which can vary widely in arrangement and amount.*

Independent-contractor pumpers are compensated under the terms of their well-services contracts. *Id.*, p. 7, ¶ 19. Some independent contractors are paid a set rate per well serviced per month, the amount of which is negotiated. *Id.* The rate can be higher or lower depending on the negotiating skill of the independent contractor and prevailing market rates in the region. *Id.* The rate can also depend on the pumping services required for the wells at issue. *Id.* For example, rates can be higher for active wells that are producing oil and/or gas, than for inactive wells that require less-frequent visits and fewer services. *Id.*

Compensation arrangements with pumpers can differ from the fixed rate per well per month. Some independent contractors are paid a set amount per month regardless of the number of wells. *Id.*, p. 7, ¶ 20. This occurs in areas where many wells that Foundation operates are located close to one another. *Id.* Moreover, some independent contractors provide non-pumping services for additional per-hour or per-service fees. *Id.*, pp. 7-8, ¶ 21. Examples of such services are maintenance of well-site batteries, spraying for weeds, or operating backhoes. *Id.*

There is a wide range in what an independent-contractor pumper might make per month. Foundation pays independent-contractor pumpers operating its wells from $260 per month to over $23,000 per month. *Id.*, p. 6, ¶ 16. The number of wells assigned to a pumper varies based on the negotiation between the pumper and Foundation. *Id.*, p., 6, ¶ 17. Pumpers may ask for additional wells or reductions in the number of their wells, and they may turn down an offer by Foundation to add wells. *Id.*, pp. 8-9, ¶ 25. Some independent-contractor pumpers are companies that have multiple employees, which can service more wells than individual pumpers. Currently, the number of wells serviced by an independent-contractor pumper varies from as many as 150 wells to as few as one well. *Id.*, p. 6, ¶ 17.

5

Independent-contractor pumpers manage their businesses to control their risks of profits or losses. For example, if pumpers perform their services skillfully and diligently, their wells tend to require less work to maintain. *Id.*, pp. 4-5, ¶ 13. A pumper can manage their time to increase efficiency, which increases the amount of time available to work on additional wells. *Id.* Pumpers also may perform pumping services for operators other than Foundation. *Id.*, p. 8, ¶ 23. For many pumpers, the more wells they can service successfully, the more money they can make. *Id.*, pp. 4-5, ¶ 13.

> E.     ***Mr. Keeton is unlikely to know about the circumstances of pumpers in regions other than the single region in which he worked.***

Mr. Keeton started working for Foundation as an employee in early 2013. *Id.*, p. 9, ¶ 28. In 2014, he asked Foundation to terminate his employment and to enter into a contract with him as an independent contractor. *Id.* Foundation agreed, terminated Mr. Keeton's employment, and entered into a well-services contract with him to provide pumping services for at least 40 wells. *Id.* His well-services contract with Foundation was terminated in May 2018. *Id.*, p. 10, ¶ 29.

As an independent contractor, Mr. Keeton had the discretion to determine the means and methods by which he provided pumping services to Foundation. *Id.*; *see also* Mr. Keeton's Well-Services Contract, ¶ 1 (Docket Entry 23-4). He set his own schedule, worked at the well sites without supervision, and provided his own tools, transportation, and insurance. *Id.*, p. 10, ¶ 29. Mr. Keeton could ask to be assigned more wells, and he could turn down Foundation's request for him to provide pumping services on additional wells. *Id.*, pp. 8-9, ¶ 25. He was free to provide pumping services to other operators and to engage in business outside of his well-services contract with Foundation. *Id.*, p. 8, ¶ 23. He could have terminated his well-services contract upon 15 days' notice at any time. *Id.*, p. 8, ¶ 23; *see also* Mr. Keeton's Well-Services Contract, ¶ 12 (Docket Entry 23-4).

6

As an independent-contractor pumper, Mr. Keeton was unlikely to have interacted with any other independent-contractor pumpers outside his region. Like most pumpers, Mr. Keeton often worked at remote well sites by himself, and he was the only pumper working on the wells assigned to him. *Id.*, pp. 5, 10, ¶¶ 14, 29. He worked on Foundation's wells solely in the Arkoma Basin, which is located in Arkansas and Oklahoma and is part of the Central Region. *Id.*, p. 9, ¶ 28. Mr. Keeton could have attended safety meetings with other Foundation independent-contractor pumpers at Foundation's office in Arkansas or on a conference call. *Id.*, p. 10, ¶ 30. However, the only pumpers that would have attended such meetings would be the ones from the Central Region. *Id.*

Further, Mr. Keeton would not have obtained information about other independent-contractor pumpers' well-services contracts from Foundation. Foundation does not disclose the terms of an independent contractor's well-services contracts (including any rates paid under the contracts) to any other independent contractors. *Id.*, p. 8, ¶ 22.

### III.   MR. KEETON HAS FAILED TO SATISFY HIS BURDEN TO SHOW A FACTUAL OR LEGAL NEXUS BINDING THE PUTATIVE COLLECTION.

When deciding whether to conditionally certify a collective action, the Court, "like practicing attorneys, has a responsibility to refrain from stirring up unwarranted litigation." *H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 401 (E.D. Tex. 1999) (citing *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995)); *Mallory v. Lease Supervisors, LLC*, No.17-3063, 2018 WL 3368913, at *2 (N.D. Tex. July 10, 2018) ("[C]ourts ... have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation.") (citation and internal quotation marks omitted). "[E]mployers should not be unduly burdened by a frivolous fishing expedition conducted by the plaintiff at the employer's expense." *Housden*, 186 F.R.D. at 401; *see also Songer v. Dillon Resources, Inc.*, 569 F. Supp. 2d 703, 707 (N.D. Tex. 2008).

7

The majority of courts entertaining motions to conditionally certify FLSA collections have used the test set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). Under *Lusardi*, certification is not "automatic." A case is not appropriate for representative treatment unless the plaintiff, at a minimum, makes substantial allegations (and typically provides some ***competent*** evidence) that: (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt-in to the lawsuit. *Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 465–66 (S.D. Tex. 2012) (citing *Aguirre v. SBC Commc'ns, Inc.*, No. 05-3198, 2006 WL 964554, at *6 (S.D. Tex. Apr. 11, 2006)); *Simmons v. T-Mobile USA, Inc.*, No. 06-1820, 2007 WL 210008, at *5 (S.D. Tex. Jan. 24, 2007) (citing *Aguirre*, 2006 WL 964554, at *6). These elements must be satisfied following an ad-hoc analysis conducted on a case-by-case basis. *Simmons*, 2007 WL 210008, at *8 (citing *Aguirre*, 2006 WL 964554, at *5). The Court is charged with determining whether "bind[ing] the claims [and] hearing the cases together promotes judicial efficiency." *Id.*; *see also Morales v. Thang Hung Corp.*, No. 08-2795, 2009 WL 2524601, at *2 (S.D. Tex. Aug. 14, 2009) (collecting cases); *Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983); *H&R Block*, 186 F.R.D. at 400; *Salinas-Rodriguez v. Alpha Servs., L.L.C.*, No. 05-44, 2005 WL 3557178 (S.D. Miss. Dec. 27, 2005); *Hall v. Burk*, No. 01-2487, 2002 WL 413901, at *3 (N.D. Tex. March 11, 2002). Accordingly, the burden is on ***Mr. Keeton*** to make "substantial allegations" that this suit should proceed collectively. *See, e.g.*, *Behnken v. Luminant Mining Co., LLC*, 997 F. Supp. 2d 511, 518 (N.D. Tex. 2014).

The last point is critical: there must be a "factual basis" – that is, ***actual evidence*** – that potential members were "together the victims of a single decision, policy, or plan" or otherwise similarly situated and that Mr. Keeton can represent the ***entire*** proposed collection for the time

period at issue. *Xavier v. Belfor USA Grp., Inc.*, 585 F. Supp. 2d 873, 877 (E.D. La. 2008) (internal citations and quotations omitted). "Courts have not established the precise quantity of evidence required in such cases, but typically, plaintiffs must rely on something more than his or her own allegations and declarations." *Williams v. Grayco Cable Servs., Inc.*, 187 F. Supp. 3d 760, 767 (S.D. Tex. 2016). "[G]eneral allegations that the [defendant] violated the FLSA are insufficient." *Quintanilla v. A & R Demolition, Inc.*, No. 04-1965, 2005 WL 2095104, at *13 (S.D. Tex. Aug. 30, 2005). Even *Lusardi* requires "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency."[1] *Simmons*, 2007 WL 210008, at *4 (quoting *Aguirre*, 2006 WL 964554, at *5) (plaintiff must allege a common policy or plan and show sufficient facts to demonstrate he and potential plaintiffs together were victims of a common policy or plan that violated the law) (citations and internal quotations omitted).

More importantly, for purposes of this Motion to Certify, the Court "may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy or practice." *Simmons*, 2007 WL 210008, at *4 (citations omitted). In other words, Mr. Keeton must make a factual showing that a "similarly situated" group of pumpers exist in relevant respects given the claims and defenses that are asserted. *Id*. at *4-5; *Carey v. 24 Hour Fitness USA, Inc.*, No. 10-3009, 2012 WL 4857562, at *1 (S.D. Tex. Oct. 11, 2012); *Cruz v. ConocoPhillips*, 208 F. Supp. 3d 811, 817–18 (S.D. Tex. 2016); *Christianson*, 2015 WL 1268259, at *3-4; *Barnes v. Abandonment Consulting Servs., L.L.C.*, No. 12-01399, 2013 WL 3884198, at *5-6 (S.D. Tex. Jul. 26, 2013).

---

[1] Indeed, some motions have been denied despite the plaintiff's submission of far more substantial evidence than Mr. Keeton has provided here. *See, e.g., Simmons*, 2007 WL 210008, at *5-8 (denying conditional certification where plaintiff provided more than twenty affidavits from other employees, in addition to his own affidavit and a job description).

Mr. Keeton alleges that he – and Foundation pumpers throughout the United States – were misclassified as independent contractors. However, there is no evidence that Foundation has a uniform policy with respect to how its pumpers are classified. To the contrary, as Mr. Keeton himself acknowledges, Foundation has pumpers that it classifies as employees and pumpers that it engages as independent contractors. Declaration of Ryan Keeton ("Keeton Declaration"), ¶ 6 (Docket Entry 23-1); Ex. "A," Payne Declaration at p. 3, ¶ 9. In the absence of a uniform policy regarding classification, this Court must satisfy itself that Mr. Keeton has provided sufficient evidence demonstrating he is similarly situated to all independent contractor pumpers with respect to his misclassification claim. He has not. Further, even if Mr. Keeton had demonstrated that these misclassification claims should proceed collectively (and he has not), he has not shown that there are pumpers interested in joining this lawsuit.

A.      ***Mr. Keeton's misclassification claim requires analysis of whether other pumpers are similarly situated under the economic-realities test.***

Mr. Keeton is subject to the FLSA's overtime provisions *only if* he is an employee rather than an independent contractor. *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 294 (S.D. Tex. 2012). Thus, while this Court need not fully resolve the question of whether Mr. Keeton is an employee or independent contractor at this stage, Mr. Keeton still must offer sufficient evidence that he and the collection he purports to represent are similarly situated vis-à-vis the economic-realities factors. *Christianson*, 2015 WL 1268259, at *3-4.[2]

In determining whether a worker qualifies as an employee for purposes of the FLSA, courts

---

[2] *Andel*, 280 F.R.D. at 289–90 ("When considering a motion for conditional certification of a collective action based on allegations of independent contractor misclassification, a court 'must analyze whether the [putative collective action members] are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors.'") (citing *Bamgbose v. Delta–T Group, Inc.*, 684 F.Supp.2d 660, 668–69 (E.D.Pa. 2010)).

focus on "whether the individual is, as a matter of economic reality, in business for himself." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379 (5th Cir. 2019); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). Under this economic-realities test, five non-exhaustive factors are relevant to this inquiry: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Id.* (citing *Hopkins*, 545 F.3d at 343). "The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010).

Mr. Keeton preemptively argues that the pumpers' employment status is a "merits-based determination" and is "improper at the notice stage of conditional certification."[3] To the contrary, courts have and do examine the question of whether the putative collective action members are similarly situated – the second prong of the *Lusardi* test – through the lens of the economic-realities test – ***without actually determining*** whether the individuals are independent contractors or employees (*i.e.*, reaching a merits-based decision).[4] If a plaintiff's allegations of

---

[3] Motion for Certification, p. 13 (Docket Entry 23).

[4] *See Andel*, 280 F.R.D. at 294-95; *Christianson*, 2015 WL 1268259, at *3-4; *Hobbs v. Cable Mktg. & Installation of Louisiana, Inc.*, 290 F. Supp. 3d 589, 596 (E.D. La. 2018); *Pierce v. Apache Corp.*, No. 18-1803, 2019 WL 338129, at *3 (S.D. Tex. Jan. 28, 2019). In addition to the decisions from this district, there are a host of additional well-reasoned opinions where the court exercised its discretion to deny certification in cases such as this, because the proof necessary to determine whether putative plaintiffs are employees or independent contractors could not generally be applied to the class as a whole. *See, e.g., Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1002–03 (D. Kan. 2018); *Pena v. Handy Wash, Inc.*, No. 14-20352, 2015 WL 11731032, at *3 (S.D. Fla. May 22, 2015); *Collinge v. IntelliQuick Delivery, Inc.*, No. 12-00824, 2015 WL 1292444 (D. Ariz. March 23, 2015); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 12-00596, 2015 WL 1346125 (W.D.N.C. March 24, 2015); *Carrera v. UPS Supply Chain Solutions, Inc.*, No. 10-60263, 2012 WL 12860750, at *8 (S.D. Fla. Sept. 14, 2012); *Demauro v. Limo, Inc.*, No. 10-413, 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011).

misclassification alone were sufficient to support the grant of conditional certification, it would eviscerate the requirement that a plaintiff make a ***factual showing*** that he and others are "similarly situated."

**B.      *Mr. Keeton has failed to produce competent evidence demonstrating the proposed collection is similarly situated.***

Courts routinely deny certification where proof of liability will turn on evidence of what each putative claimant does on a daily basis as required by different supervisors in different locations. *See Christianson*, 2015 WL 1268259, at *3-4; *Andel*, 280 F.R.D. at 290. Thus, it is entirely appropriate for this Court to examine the evidence (or lack thereof) offered by Mr. Keeton to determine whether, under the economic-realities test, Mr. Keeton has satisfied *Lusardi*. Not only has Mr. Keeton failed to meet his burden, the evidence submitted by Foundation demonstrates that the varied experiences of pumpers throughout the United States makes it inefficient and inappropriate to proceed collectively.

1.      <u>**Mr. Keeton's Declaration is plainly insufficient to meet his burden**</u>.

Courts considering motions for conditional certification often have the benefit of multiple plaintiffs who have already opted in and/or affidavits from more than one plaintiff or potential opt-in plaintiffs. This action has only one plaintiff, Mr. Keeton, and the Motion for Conditional Certification is supported by only one declaration – Mr. Keeton's.[5] This would be sparse evidence even if Mr. Keeton was only seeking to represent pumpers located in the Central Region.[6]

But Mr. Keeton's proposed collection includes pumpers across the United States servicing

---

[5] *See* Keeton Declaration (Docket Entry 23-1).

[6] *McKnight v. D. Houston*, 756 F. Supp. 2d 794, 805 (S.D. Tex. 2010) (declining to certify collection beyond particular location where no other employee from any other location was participating in the litigation) (collecting cases).

wells on which he admittedly did not work, performing a wide range of different services he never performed, with managers and other Foundation personnel with whom he never interacted, receiving compensation of which he has no knowledge.[7] Mr. Keeton has not identified a single potential opt-in from any other part of the country, and has not attached a declaration from any other pumper who ever worked with Foundation or provided any evidence regarding the type of services performed on any wells beyond his own on which this Court might actually rely in evaluating whether Foundation pumpers are similarly situated to Mr. Keeton.[8] There is simply no factual basis for this Court to find that Mr. Keeton is similarly situated to and capable of representing the entire proposed collection.

Courts routinely deny conditional certification based on such threadbare and speculative evidence, and this Court should do so here.[9]

---

[7] *Shanks v. Carrizo Oil & Gas, Inc.*, No. 12-3355, 2013 WL 6564636, at *5 (S.D. Tex. Dec. 11, 2013) (finding that plaintiff failed to provide court with reasonable basis to conclude other workers were similarly situated to him where declaration does not offer any explanation of any evidence or experience forming the basis of the conclusions and states conclusory and unsupported allegations); *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703, 707 (N.D. Tex. 2008) (where a declaration is offered as evidence of a common policy or practice applicable to all potential class members, it must "establish that the plaintiff[] ha[s] ***personal knowledge of those matters as they pertain to any other [worker]***." (emphasis added)); *see Parker v. Silverleaf Resorts, Inc.,* No. 14-2075, 2017 WL 1550522, at *7 (N.D. Tex. May 1, 2017) (limiting scope of conditional certification due to plaintiff's lack of personal knowledge regarding whether employees at other location were "similarly situated"); *see Owen v. Golf & Tennis Pro Shop, Inc.,* No. 09-00571, 2010 WL 3859640, at *4 (E.D. Tex. Sept. 30, 2010) (declarations not based on personal knowledge do not meet the *Lusardi* standard).

[8] In fact, Mr. Keeton references his conversations with unnamed "coworkers" that told him that Pumpers perform the "same general job duties." Keeton Declaration, ¶ 8 (Docket Entry 23-1). Mr. Keeton has offered nothing to explain how these anonymous "coworkers" could possibly speak to this issue.

[9] *See Dorsey v. J & V Commc'n Servs., Inc.*, No. 04-0496, 2004 WL 5621864, at *2 (S.D. Tex. May 19, 2004) (denying conditional certification where the plaintiffs presented evidence stating only that they were "aware" of others doing the same job); *Yaklin v. W-H Energy Servs., Inc.*, No. 07-422, 2008 WL 1989795, at *3 (S.D. Tex. May 2, 2008) (finding the affidavit insufficient where "the affidavit sets forth Rojas's jobs responsibilities and payment provisions alone, and fails to discuss the job responsibilities and payment provisions of his allegedly similarly situated peers"); *Trinh v. JP Morgan Chase & Co.*, No. 07-1666, 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008) ("Plaintiffs provide no real evidence, beyond their own speculative beliefs, suggesting that all JPMorgan loan officers across the country, regardless of location or experience, receive the same compensation and are required to work in the same manner").

2.   **Foundation's evidence confirms Mr. Keeton is not similarly situated to other pumpers throughout the nation.**

Even if Mr. Keeton had produced some competent evidence in support of collective certification (and he has not), Foundation's evidence confirms that the collection Mr. Keeton proposes is patently unworkable, as it encompasses not only individuals, like Mr. Keeton, but also entities such as limited liability companies and sole proprietorships (that could not, as a matter of law, be considered employees)[10] that work in different regions, with different types of wells, under different operations managers and/or foremen at Foundation, and under individually-negotiated agreements.[11] The factual disparities between the members of the proposed collection become even more apparent when applying the economic-realities factors:

*Degree of Control*

- Pumpers work in one of four different regions throughout the United States under different operations superintendents and foremen.[12]

- Within the four regions, different personnel are involved in the decision of whether to engage a pumper and different criteria is involved in determination the type and number of wells that will be assigned to that pumper under a well-services contract.[13]

- Each well is unique, and a pumper must be able to exercise independent judgment and use their discretion to determine what services need to be performed, how often to visit a well, and also be able to make on-the-ground

---

[10] Ex. "A," Payne Declaration, ¶ 9; *Phillips v. Carpet Direct Corp.*, No. 16-02438, 2017 WL 121630, at *5 (D. Colo. January 10, 2017) (granting motion to dismiss based on the Court's determination that Congress intended only individuals, and not entities, be permitted to bring claims for violations of the FLSA.").

[11] Ex. "A," Payne Declaration, ¶¶ 3, 4, 6, 9, 17, 19-21; *see Botello v. COI Telecom, L.L.C.*, No. 10-305, 2010 WL 5464824, at *7 (W.D. Tex. Dec. 30, 2010) (denying certification where workers who worked in different regions were treated substantially different and many would have their claims subject to arbitration agreements).

[12] Ex. "A," Payne Declaration, pp. 2-3, ¶¶ 3, 4, 9.

[13] *Id.*, pp. 3-4, 8, ¶¶ 10, 11, 12, & 25.

14

decisions, and to solve problems without oversight.[14]

- Depending on the well or the particular foreman, pumpers have varied reporting obligations and interactions with Foundation personnel.[15]

*Relative Investments By The Pumpers*

- Pumpers are permitted to – and some do – engage others to assist them in servicing wells.[16]
- Pumpers provide their own tools to perform their services.[17]
- Pumpers are responsible for providing their own phones, laptops, vehicles, and purchasing insurance for themselves and anyone who works under their well-services contract.[18]

*Degree of Opportunity for Profit or Loss*

- Pumpers individually negotiate their well-services contracts with Foundation – the rates vary based on, among other things, location, expertise, or on the types of wells assigned.[19]
- Some pumpers perform certain additional services for Foundation, which might be part of the total negotiated rate in the well-services contract or invoiced to Foundation separately.[20]
- Pumpers are assigned particular wells based on their experience in the industry, particular skillset, location, or capacity.[21]
- Pumpers can be assigned anywhere from 1 to 150 wells, and can make anywhere from $260 to over $23,000 per month.[22]

---

[14] *Id.*, pp. 2-4, 10, ¶¶ 5, 6, 12, 13, and 29.

[15] *Id.*, pp. 3-5, ¶¶ 10, 12, 13, 14, and 15.

[16] Mr. Keeton's Well-Services Contract, ¶ 6 (Docket Entry 23-4); Ex. "A," Payne Declaration, pp. 6, 8, ¶¶ 17, 26.

[17] Ex. "A," Payne Declaration, pp. 6-7, ¶ 18.

[18] Mr. Keeton's Well-Services Contract, ¶ 11 (Docket Entry 23-4); Ex. "A," Payne Declaration, pp. 6-7, ¶ 18.

[19] Ex. "A," Payne Declaration, pp. 6-9, ¶¶ 17, 19, 20, 25, 26.

[20] *Id.*, pp. 7-8, ¶ 21.

[21] *Id.*, pp. 4, 6-9, ¶¶ 12, 16, 17, 19, 25.

[22] *Id.*, pp. 6, ¶¶ 16, 17.

- Pumpers can – and many do – also contract to perform services with other operators and engage in services unrelated to the oil and gas industry.[23]
- Pumper can – and many do – terminate their well-services contract to pursue work with other companies that might have more competitive rates.[24]

*Skill and Initiative Required to Perform Job*

- Pumpers must have certain minimum qualifications to be engaged as an independent contractor, but pumpers engaged by Foundation have a wide variety of industry experience, skillsets, and educational background.[25]
- More-skilled pumpers tend to take less time servicing their wells, and are generally able to service more wells than less-skilled or experienced pumpers.[26]

*Degree of Permanency*

- Pumpers may work with Foundation for varying lengths of time.[27]

Ultimately, the competent evidence demonstrates a vast range of variability between each independent contractor, beginning with the specific terms the pumper negotiates in his/her/its contract. The very nature of the job – servicing unique wells – only adds to the variances between these contractors' particular job duties; one pumper may spend hours at a single well, while another pumper may spend less time overall but service more wells.[28] Each pumper, however, negotiates (and can re-negotiate) the terms upon which they choose to work. Based on this limited evidence, it is clear that Mr. Keeton has not and cannot make even a modest showing factual showing that the putative collection is similarly situated.

---

[23] *Id.*, pp. 8, ¶ 23.

[24] *Id.*

[25] *Id.*, pp. 3-4, ¶¶ 8, 12.

[26] *Id.*, pp. 4-6, ¶¶ 13, 17.

[27] *See* Mr. Keeton's Well-Services Contract, ¶ 12 (Docket Entry 23-4).

[28] Ex. "A," Payne Declaration, pp. 4-5, ¶ 13.

16

### C.     Mr. Keeton has not shown other pumpers are interested in joining this suit.

Even assuming that Mr. Keeton had provided sufficient evidence and allegations and could provide a plausible basis for seeking certification of a nationwide collection of pumpers (which he cannot), there is no indication that other individuals desire to opt in to this action. *Mason v. Amarillo Plastics Fabricators*, No. 15-00109, 2015 WL 4481233, at *5 (N.D. Tex. July 22, 2015) ("Affidavits asserting that other potential plaintiffs wish to opt into the lawsuit are a nearly universal prerequisite to notice and conditional certification of an FLSA collective action."); *Mallory,* 2018 WL 3368913, at *3 (absence of additional affidavits "strongly suggests that there is no class of similarly situated [individuals] who are willing to participate in this collective action."); *Flores v. Act Event Servs., Inc.,* 55 F. Supp. 3d 928, 934 (N.D. Tex. 2014) (Fish, J.) ("[R]eceiving conditional certification requires plaintiffs to 'produce evidence which allows the Court to conclude that a reasonable basis exists for finding that there are similarly situated employees who wish to opt-in to the action.'") (quoting *Dyer v. Lara's Trucks, Inc.,* No. 12-1785, 2013 WL 609307, at *3 (N.D. Ga. Feb. 19, 2013)); *Magana v. Shore Constr., LLC,* No. 17-1896, 2018 WL 1316941, at *6 (E.D. La. March 14, 2018) (Plaintiff falls short of *Lusardi* when he "fails to present an affidavit or even the name of a single similarly-situated employee."); *Barnes v. Abandonment Consulting Services, L.L.C.*, 2013 WL 3884198, at *5 (S.D. Tex. July 26, 2013) (denying certification; ". . . perhaps most crucially, [Plaintiff] cannot show that any Rig Clerks, even assuming they are 'similarly situated,' wish to opt-in to this lawsuit").[29] In fact, there is

---

[29] *See Yoakum v. PBK Architects, Inc.,* No. 10-00278, 2010 WL 4053956, at *5 (S.D. Tex. Oct. 14, 2010) ("One consent is not enough" to justify certification of representative action); *Morales,* 2009 WL 2524601, at *3 ("[o]ne affidavit is not enough to establish that the collective action, along with the expensive notice it requires, is the most efficient way to proceed with litigation."); *Ali v. Sugarland Petroleum,* No. 09-0170, 2009 WL 5173508, at *5 (S.D. Tex. Dec. 22, 2009) ("[p]laintiffs must submit more evidence than a single affidavit to demonstrate that other plaintiffs exist, that they were subject to a similar policy regarding overtime compensation, and that they wish to join the suit."); *Romero v. J&F Analysts Inc.,* No. 15-00790, 2016 WL 612594, at *4 (S.D. Tex. Feb. 16, 2016) (denying

17

evidence to the contrary.

Here, Mr. Keeton contends that he has had conversations with "several" pumpers (whose identities or locations where they worked are not disclosed) who were allegedly classified as independent contractors for Foundation regarding the fact of the litigation and the claims asserted herein.[30] From those alleged conversations, he offers his own opinion that others "would be interested to learn about their rights and their opportunity to join this lawsuit."[31] Though the exact number of individuals with whom Mr. Keeton allegedly spoke is not known, over the past ten months since this litigation has been filed, not one other person has opted-in or even provided a Declaration to support any of Mr. Keeton's allegations. And, contrary to Mr. Keeton's suggestion, his sole declaration is simply not enough to warrant notice under these circumstances. S*ee Blake v. Hewlett-Packard Co.*, No. 11–592, 2013 WL 3753965, at *12 (S.D. Tex. July 11, 2013) (denying motion for nationwide notice where only one individual had opted-in, "despite plaintiff's repeated claims that he knows of and is familiar with other similarly situated employees in both Houston and at other locations.").[32] Given the clear lack of interest, certification and issuance of a notice

---

certification without prejudice: "No potential plaintiffs are identified by name, no affidavits by these co-workers were submitted, and there is not even a statement in Plaintiffs' affidavits that they believe such individuals would be interested in joining the lawsuit.").

[30] Keeton Declaration, ¶ 21 (Docket Entry 23-1).

[31] *Id*.

[32] Closer examination of the decisions cited in Mr. Keeton's Brief confirms his assertions regarding an acceptable absence of opt-in participants is an overstatement. *Compare Ecoquij-Tzep v. Hawaiian Grill*, No. 16-625, 2017 WL 2672328, at *4 (N.D. Tex. June 21, 2017) (certification limited to single restaurant and plaintiff "has shown that there are at least five potential class members who are similarly situated"); *Baucum v. Marathon Oil Corp.*, No. 16-3278, 2017 WL 3017509, at *7 (S.D. Tex. July 14, 2017) (plaintiff submitted two additional opt-in declarations in support of his motion); *Villareal v. St. Luke's Episcopal Hospital*, 751 F. Supp. 2d 902, 916 (S.D. Tex. 2010) ("Plaintiff presents the court with three declarations in support of his assertion that there were other non-exempt, aggrieved individuals. . ."); *Coffin v. Blessey Marine Services, Inc.*, No. 11-0214, 2011 WL 13242968, at *3 (S.D. Tex. July 28, 2011) ("One other BMSI Tankerman. . . has already opted into this suit . . ."); *Gobson v. NCRC, Inc.*, No. 10–1409, 2011 WL 2837506, at *7 (S.D. Tex. July 18, 2011) ("[Plaintiff] has identified a significant number of other similarly situated field service technicians."); *Dreyer v. Baker Hughes Oilfield Operations, Inc.*, No. 08-1212, 2008 WL

would be a waste of the parties' and this Court's resources.

> D.   ***In the alternative, any collective action should be strictly limited to persons with circumstances similar to Mr. Keeton.***

In the alternative, the conditional certification should be strictly limited to independent-contractors similarly situated to Mr. Keeton. There are many differences between Mr. Keeton and the nationwide collection of pumpers he has proposed. For example, some are companies with their own employees rather than individuals. Some are located outside the Central Region where Mr. Keeton worked (and Mr. Keeton is unlikely to have any knowledge about such pumpers and their arrangements). Some have different payment arrangements than those in the only well-services contract Mr. Keeton has submitted (his own), such as payment of a flat fee per month rather than per-well and additional payments for providing non-pumping services. Accordingly, while certification should be denied outright, in the alternative Foundation requests that the Court limit the collective action to:

> **All pumpers who worked for Foundation in the past three years who were classified as independent contractors, were individuals with no employees or subcontractors of their own, performed services on wells in Foundation's Central Region, were paid a set amount for each well serviced, and were not paid additional amounts for providing non-pumping services to Foundation.**

## IV.   FOUNDATION OBJECTS TO MR. KEETON'S PROPOSED NOTICE.

The Court should reject Mr. Keeton's request to approve a notice for two reasons: (1) it is premature; and (2) it is objectionable on its face.

> A.   ***Foundation objects to the court issuing the notice without a conference of counsel and additional briefing.***

Foundation objects to the proposed Notice Mr. Keeton submitted with his Motion. As this

---

5204149, at *4 (S.D. Tex. Dec. 11, 2008) (Two named plaintiffs and court limited collective to the specific team on which the subject IT analysts were employed).

Court has done before, if the Motion to Certify is granted, the Court should order the parties to meet and confer regarding the proposed notice before it is submitted for approval. *See Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 826 (N.D. Tex. 2007) (Fish, J.) ("The parties are ordered to confer with each other to resolve their differences regarding the notice.").[33] The need to confer is particularly important here where the proposed notice suffers from a host of problems.

> B.    *The proposed notice is improper and insufficient.*

"The purpose of the notice is to provide potential plaintiffs with a neutral discussion of the nature of the action." *Heaps v. Safelite Solutions, LLC*, No. 10-729, 2011 WL 1325207, at *9 (S.D. Ohio Apr. 5, 2011) (citing *Monroe v. United Air Lines, Inc.,* 90 F.R.D. 638, 640 (D.C. Ill. 1981)). Ignoring the need for a neutral and complete statement of the legal implications of joining this lawsuit, Mr. Keeton has presented the Court with a proposed notice which omits any mention of the inherent risks of opting-in, the obligations associated with participating in litigation, and a fair and balanced explanation of Foundation's defenses.

In determining the adequacy and appropriateness of notice in a collective action, "[c]ourts consider the overarching policies of the collective suit provisions" and whether the proposed notice provides "accurate and timely notice concerning the pendency of the collective action, so that [an individual receiving the notice] *can make an informed decision about whether to participate*."

---

[33] *See Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 473 (S.D. Tex. 2012) ("Finally, the Court orders the parties to confer about the content of the notice, and to provide the Court with a proposed notice within 14 days of the date of this Order. Additionally, the parties should confer about the proper method for distribution and return of the notices. If the parties cannot agree upon either of these issues, they must each file their proposed notice and proposed method of distribution and return."); *Santinac v. Worldwide Labor Support of Illinois, Inc*., 107 F. Supp. 3d 610, 613 (S.D. Miss. 2015) ("The parties are directed to confer on a proposed notice which takes into account the Court's rulings herein on Defendants' objections contained in their Response to the Motion, and to submit the proposed notice to the Court within twenty-eight (28) days of the date of this Order."); *Bosley v. Chubb Corp*., No. 04-4598, 2005 WL 1334565, at *5 (E.D. Pa. June 3, 2005) (ordering that the parties will meet and confer on notice before court would consider proposed notice).

*Alverson v. BL Rest. Operations LLC*, No. 16-00849, 2018 WL 1324952, at *1 (W.D. Tex. Mar. 12, 2018) (citing *Delaney v. Geisha NYC, LLC*, 261 F.R.D. 55, 59 (S.D.N.Y. 2009)) (emphasis added); *see Behnken v. Luminant Mining Co., LLC*, 997 F. Supp. 2d 511, 523 (N.D. Tex. 2014).

Mr. Keeton's proposed Notice is inappropriate for several reasons, including, but not limited to:

1. It fails to advise potential claimants they may be liable for payment of Foundation's costs associated with the lawsuit if Foundation prevails, and rather incorrectly informs them that they will have no such liability at all even if they lose.[34]

2. It does not provide claimants with sufficient facts for them to determine if they are similarly situated to Mr. Keeton.

3. It fails to inform potential plaintiffs of their right to choose their own counsel.[35]

4. It does not direct potential opt-in plaintiffs to return their completed notice to the Court, rather than to plaintiffs' counsel.[36]

---

[34] *Behnken,* 997 F. Supp. 2d at 524 (finding proposed notice not accurate as to potential liabilities where it failed to apprise potential opt-in plaintiffs that they may be required to pay court costs if the judgment is unfavorable to them); *Yaklin*, 2008 WL 1989795, at *4 ("The Court agrees that the notice must inform potential class Plaintiffs that they may contact any attorney of their choosing to discuss the case."); *Heaps*, 2011 WL 1325207, at *8 (holding that potential claimants should be informed of their potential financial liability in a FLSA collective action notice); *see also Creten-Miller v. Westlake Hardware, Inc.*, No. 08-2351, 2009 WL 2058734, at * 4 (D. Kan. July 15, 2009); *Labrie v. UPS Supply Chain Solutions, Inc.*, No. 08-3182, 2009 WL 723599, at *8 (N.D. Cal. Mar. 18, 2009); *Hoffman v. Securitas Sec. Servs.*, No. 07-502, 2008 WL 5054684, at *15 (D. Idaho Aug. 27, 2008).

[35] *Ratliff v. Pason Sys. USA Corp.,* 196 F. Supp. 3d 699, 702 (S.D. Tex. 2016) ("Informing potential plaintiffs of their right to choose their own counsel is an appropriate element in a notice.") (quoting *Heaps*, 2011 WL 1325207, at *9); *Heaps*, 2011 WL 1325207, at *9 (S.D. Ohio Apr. 5, 2011) (requiring that notice contain "a statement indicating that the opt-in plaintiffs are entitled to be represented by the named [p]laintiffs' counsel or by counsel of his or her own choosing") (collecting supporting cases); *see Garcia v. Pancho Villa's of Huntington Village, Inc*., 678 F.Supp.2d 89, 95 (E.D.N.Y. 2010) (rejecting a proposed notice and consent form stating that "[i]f you choose to join this suit, and agree to be represented by the plaintiffs' attorneys, your counsel in this action will be [plaintiffs' attorneys]" because the language failed to make clear that "proposed plaintiffs are not required to accept plaintiffs' counsel as their own.").

[36] *See Yaklin*, 2008 WL 1989795, at *4 ("The Court also holds that class members who wish to opt-in must return their opt-in forms directly to the Court, . . .").

5.      It does not fully explain Foundation's bases for disputing liability.[37]

Furthermore, Mr. Keeton proposes that, in the event an email or mailing is returned as undeliverable, he should additionally be able to contact them via telephone. Courts in this Circuit have disallowed the use of telephone numbers for personal calls, particularly where the plaintiff's counsel already is using another method of notice (*e.g*., mail). Here, Mr. Keeton proposes using **both** e-mail and mail to contact the potential opt-in plaintiffs. No further intrusive contact is warranted. As this Court reasoned in *Aguilar v. Complete Landsculpture, Inc.*, regarding telephone numbers, "highly personal information about persons who may in fact have no interest in this litigation should not be disclosed on the thin basis that [plaintiff's] counsel desires it." No. 04-0776, 2004 WL 2293842, at *5 (N.D. Tex. Oct. 7, 2004) (citation and internal quotation marks omitted); *see also Behnken*, 997 F. Supp. 2d at 526 (disallowing discovery of telephone numbers for contacting potential opt-in plaintiffs). Having two means of contact is more than sufficient, and despite the proposed telephone-call script, permitting calls to potential opt-in plaintiffs creates the appearance of judicial endorsement of the action.

Foundation further objects to the language in paragraph 4 of Mr. Keeton's proposed Order, which states that Foundation may "take down the posted Notice and Consent forms" 60 days after Notice and Consent forms are sent to putative class members. Proposed Order at 2 (Docket Entry 22-1). Mr. Keeton has not requested that Foundation post any Notice or Consent forms, nor should Foundation be required to do so.

As noted in the previous section, resolution of all of these disputes should await this Court's decision on conditional certification, and then should be made only after the parties have met and

---

[37] *Id.* ("[T]he notice to potential class members must contain a brief explanation of Defendants' bases for disputing liability.").

conferred on the notice or briefed the issue before this Court if agreement cannot be reached.

## V.   CONCLUSION

Although perhaps lenient, the standard for conditional certification requires more than "general allegations that the employer violated the FLSA." Without anything beyond a self-serving declaration and documents related to his work on his wells, Mr. Keeton asks this Court to certify a collective action that spans multiple types of work, locations, personnel, and pay arrangements. That is not sufficient. Rather, the law requires Mr. Keeton to demonstrate that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist across the full scope of the proposed collection; (2) those aggrieved individuals are similarly situated to him in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit. Mr. Keeton's burden exists as to the *entire* collection. He has not satisfied his burden even with respect to pumpers in the Central Region, much less for all pumpers throughout the United States.

Accordingly, for the reasons set forth above, Foundation requests that the Court deny Mr. Keeton's Motion for Conditional Certification. In the alternative Foundation requests that the Court limit the collective action to:

> **All pumpers who worked for Foundation in the past three years who were classified as independent contractors, were individuals with no employees or subcontractors of their own, performed services on wells in Foundation's Central Region, were paid a set amount for each well serviced, and were not paid additional amounts for providing non-pumping services to Foundation.**

DATED: May 27, 2019.

By: */s/ Scott Griffith*
    Scott Griffith (Lead Counsel)
    State Bar No. 08482150
    sgriffith@griffithdavison.com
    Jason L. Cagle
    State Bar No. 24027540

23

jcagle@griffithdavison.com

**GRIFFITH DAVISON, P.C.**
13737 Noel Road, Suite 850
Dallas, Texas 75240
T: 972-392-8900
F: 972-392-8901

**ATTORNEYS FOR FOUNDATION ENERGY MANAGEMENT, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record pursuant to the Local Rules. A printed Judge's Copy of the foregoing will be sent to the Court at 1100 Commerce St., Rm. 1404, Dallas, Texas 75242 in compliance with the Judge's Copy Requirements.

*/s/ Scott Griffith*
Scott Griffith

24